ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 0 1 2026

at 2 o'clock and ___ min. P M
Lucy H. Carrillo, Clerk

OMEED A. ASSEFI
Acting Assistant Attorney General
United States Department of Justice
Antitrust Division

REBECCA A. BERS, Trial Attorney
DON DANIEL, Trial Attorney
MATTHEW CHOU, Trial Attorney
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, California 94102-3478
Telephone: (415) 934-5300
Facsimile: (415) 934-5399
Email: Rebecca.Bers@usdoj.gov

KENNETH M. SORENSON
United States Attorney
District of Hawaii

AISLINN K. AFFINITO
Chief, Major Crimes

DARREN W.K. CHING #6903
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
Email: Darren.Ching@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALAN HAYWARD JAMES,<br><br>Defendant. | ) Case No. CR26-00031 SASP<br>)<br>) MEMORANDUM OF PLEA<br>) AGREEMENT<br>)<br>) DATE: April 1, 2026<br>) TIME: 11:15 am<br>) JUDGE: Shanlyn A.S. Park<br>)<br>) |

**MEMORANDUM OF PLEA AGREEMENT**

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the

UNITED STATES OF AMERICA,[1] by its attorneys, and the defendant, ALAN

---

1 The terms "United States of America," "United States," "government," or
"prosecution" herein shall refer to the United States Department of Justice

HAYWARD JAMES, and his attorney, Erica Giese, Esq., have agreed upon the following:

## THE CHARGES

1. The defendant acknowledges that he has been charged in an Information with violating 18 U.S.C. § 1349, Conspiracy to Commit Wire Fraud (Count One); 18 U.S.C. §§ 201(b)(1)(B), 2, Bribery (Count Two); and 15 U.S.C. § 1, Conspiracy to Rig Bids (Count Three).

2. The defendant has read the charges against him contained in the Information, and those charges have been fully explained to him by his attorney.

3. The defendant fully understands the nature and elements of the crimes with which he has been charged, which are:

   a. The elements of the crime of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349, as charged in Count One of the Information as to the defendant, are as follows:

      i. Beginning in at least April 2016 and continuing to in or about April 2025, there was an agreement between two or more persons to commit wire fraud in violation of 18 U.S.C. § 1343; and

---

Antitrust Division and the United States Attorney's Office for the District of Hawaii.

ii. The defendant became a member of the conspiracy knowing of its object and intending to help accomplish it.

iii. The elements of the crime of wire fraud, in violation of 18 U.S.C. § 1343, are as follows:

1. The defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

2. The statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3. The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

4. The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

3

b. The elements of the crime of bribery, by aiding and abetting, 18 U.S.C. §§ 201(b)(1)(B), 2, as charged in Count Two of the Information as to the defendant, are as follows:

i. Coconspirator companies and coconspirator individuals committed the crime of bribery. Specifically:

1. Coconspirator companies and coconspirator individuals gave, offered, or promised something of value to Coconspirator Individual 1;

2. Coconspirator companies and coconspirator individuals acted corruptly, that is, with the intent to influence Coconspirator Individual 1 to commit or allow fraud on the United States; and

3. Coconspirator Individual 1 was a federal public official.

ii. The defendant intentionally helped coconspirator companies and coconspirator individuals commit bribery. Specifically:

1. The defendant aided, counseled, commanded, induced, and procured coconspirator companies and coconspirator individuals with respect to

4

giving, offering, or promising something of value to Coconspirator Individual 1;

2. The defendant acted with the intent to facilitate the bribery;

3. The defendant acted before the bribery was complete.

c. The elements of the crime of conspiracy to rig bids, in violation of 15 U.S.C. § 1, as charged in Count Three of the Information as to the defendant, are as follows:

i. A conspiracy between two or more competitors to rig bids for IT contracts with the Department of Defense (DOD) existed from at least May 2019 and continued to at least October 2022;

ii. The defendant knowingly joined the conspiracy; and

iii. The conspiracy either substantially affected interstate commerce in goods or services or occurred within the flow of interstate commerce in goods or services.

## THE AGREEMENT

4. The defendant agrees to waive indictment and enter a voluntary plea of guilty to the Information, which charges him with conspiracy to commit wire

fraud (Count One), bribery (Count Two), and conspiracy to rig bids (Count Three). The defendant is aware that he has the right to have these felonies asserted against him by way of grand jury indictment. The defendant hereby waives this right and consents that these offenses may be charged against him by way of the Information. In return, the government agrees not to file other charges against the defendant related to the conspiracies to which the defendant is pleading guilty and the government agrees to be bound by the stipulations set forth in paragraph 10 of this Agreement.

5.      The defendant agrees that this Memorandum of Plea Agreement shall be filed and become part of the record in this case.

6.      The defendant enters this plea because he is in fact guilty of conspiracy to commit wire fraud, bribery, and conspiracy to rig bids as charged in Counts One, Two, and Three of the Information, and he agrees that this plea is voluntary and not the result of force or threats.

**PENALTIES**

7.      The defendant understands that the penalties for the offenses to which he is pleading guilty include:

a.      As to Count One, a term of imprisonment of up to 20 years and a fine of up to $250,000, plus a term of supervised release up to three years.

6

b.      As to Count Two, a term of imprisonment of up to 15 years and a fine of up to three times the monetary equivalent of the thing(s) of value, plus a term of supervised release up to three years.

c.      As to Count Three, a term of imprisonment of up to ten years and a fine of up to $1,000,000, plus a term of supervised release up to three years.

d.      In addition, the Court must impose a $100 special assessment as to each count to which the defendant is pleading guilty. The defendant agrees to pay $100 for each count to which he is pleading guilty to the District Court's Clerk's Office, to be credited to said special assessments, before the commencement of any portion of sentencing. The defendant acknowledges that failure to make such full advance payment in a form and manner acceptable to the prosecution will allow, though not require, the prosecution to withdraw from this Agreement at its option.

e.      **Statutory Debarment**:  The defendant understands that, upon sentencing, the Antitrust Division will report his conviction to the Department of Justice's Bureau of Justice Assistance pursuant to 10 U.S.C. § 4656 for inclusion in the Defense Procurement Fraud Debarment Clearinghouse database and the System for Award Management. The defendant understands that 10 U.S.C. § 4656 provides for a mandatory term of debarment of at least five years, which term may only be waived if the Secretary of Defense determines a waiver is in the interests

of national security. The defendant understands that he may be subject to additional suspension or debarment actions by state or federal agencies other than the prosecution, based upon the conviction resulting from this Plea Agreement and upon grounds other than 10 U.S.C. § 4656, and that this Plea Agreement in no way controls what additional action, if any, other agencies may take. However, the prosecution agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such additional action of the fact, manner, and extent of the cooperation of the defendant as a matter for that agency to consider before determining what action, if any, to take. The defendant nevertheless affirms that he wants to plead guilty regardless of the suspension or debarment consequences of his plea.

f. **Restitution.** The Court must also award restitution pursuant to Title 18, United States Code, Section 3663A, to the persons and entities victimized by the defendant's offenses, including the DOD. The defendant understands that the Court will determine the amounts of restitution to be ordered, as well as the persons and entities entitled to such restitution, with the assistance of the United States Probation Office. The defendant agrees to pay restitution for all losses caused by the defendant's conduct and that defendant is jointly and severally liable for those losses caused by the defendant's and other co-defendants' joint conduct.

Specifically, the defendant agrees to pay restitution to the victims of the offenses in an amount of not less than $1,451,656.80.

## FACTUAL STIPULATIONS

8.     The defendant admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charges to which the defendant is pleading guilty:

### Introduction

a.     From at least April 2016 and continuing to in or about April 2025, in the District of Hawaii and elsewhere, the defendant together with other coconspirators falsely inflated the value of Information Technology (IT) contracts with the U.S. Air Force and coordinated with other coconspirators who agreed to use the excess funds to pay defendant, defendant's family members, the family of Coconspirator Individual 1, and other coconspirators. From at least May 2019 and continuing to at least October 2022, the defendant also directed coconspirators who were supposed to be competing to win government contracts on the amounts they should submit on their bids in order to circumvent the competitive bidding process. As a result of the defendant's actions, the government overpaid for IT contracts by at least $37 million.

b.     From approximately 2014 until in or around January 2018, the defendant was an active duty member of the Air Force serving as a Contracting

Officer's Representative (COR) for the Pacific Air Forces (PACAF). The defendant was a COR or acted as a government representative on contracts administered through, among other agencies, Defense Information Systems Agency (DISA), Defense Information Technology Contracting Organization (DITCO), and U.S. General Services Administration (GSA).

c.      A COR is responsible for drafting contracting documents (here, for the provision of IT equipment and services to PACAF), to include market research reports, Independent Government Cost Estimates (IGCEs), and lists of materials and labor required under contracts—often known as Performance Work Schedules (PWSs). The defendant knew that, as a COR, he was prohibited from, among other things, discussing or releasing source selection sensitive information, including IGCEs, with anyone who did not have a need to know; directing contractors on how to carry out their contractual responsibilities; creating an employer-employee relationship with any contractor personnel; accepting special favors or gratuities from any contractor; and having a conflict of interest on his own or through his family members' interests. Coconspirator Individual 1 supervised the defendant.

d.      On or around January 31, 2018, the defendant retired from the Air Force. Coconspirator Individual 1 remained a federal government employee with Coconspirator Individual 1's same responsibilities. Even after the defendant

was no longer a COR, Coconspirator Individual 1 continued to rely on and direct the defendant to draft contracting documents for the provision of IT services and equipment to PACAF, including market research reports, IGCEs, and PWSs. The defendant knew that such source selection sensitive information should be kept confidential, and that strict rules govern conflicts of interest and receipt of favors or gratuities among contracting professionals who direct government spending. The defendant did not have a contract with PACAF to assist Coconspirator Individual 1. Instead, the defendant conspired with Coconspirator Individual 1 and others to build excess funding into government contracts that was used to unlawfully enrich the defendant, other coconspirators, and their friends and family members.

e.    The coconspirators used shell companies to facilitate the transfer of excess funding siphoned from government contracts. The defendant received unlawful payments through T.R.A.P. LLC (TRAP), a shell company he established in approximately November 2017.

### Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349)

f.    From at least as early as April 2016 and continuing to in or about April 2025, the defendant and others intentionally conspired to commit wire fraud, in the District of Hawaii and elsewhere.

11

g.     Using Coconspirator Individual 1's official position, the defendant and others, with the intent to deceive and cheat, (i) ensured that sole-source contracts for IT projects would be awarded to known coconspirators; (ii) fraudulently inflated the ICGEs for IT contracts by including unnecessary material and labor; (iii) provided IGCEs to coconspirators, allowing those coconspirators to include those inflated costs in their submissions to the government; (iv) submitted and/or approved falsified invoices, verifying that material and labor had been provided when in fact it had not; and (v) directed winning government contractors to unlawfully pay coconspirators, their family members, and others who provided no material and performed no labor on those government contracts, including through the use of shell companies.

h.     Even though the defendant intentionally inflated IGCEs, he and others presented the estimates as accurate to the federal government. The DOD and GSA relied on the accuracy of the falsified IGCEs and falsified invoices in making financial decisions, including but not limited to, awarding contracts, approving payments, and determining whether bids or proposals presented a fair and reasonable price.

i.     The defendant and others sent wire communications to further the conspiracy, including falsified invoices and quotes, payments for material line items not delivered, and payments to individuals who did not perform labor under

12

the contracts. It was also reasonably foreseeable to the defendant that others would transmit false documents and proceeds of the fraud via interstate wire communication.

***Contracts Inflated to Enrich the Defendant and Conspirators***

j.      The defendant and Coconspirator Individuals 1-11 conspired to (i) falsely inflate multiple IT contracts, causing the government to pay a premium of over $37 million on IT contracts serving U.S. Air Force installations across the Pacific and then (ii) distribute the premium the government paid on those contracts between and amongst coconspirators and their friends and family members. The defendant and coconspirators falsely inflated, among others, contracts relating to Cyber Resiliency Experienced Workforce, Data Center Sustainment, End User Computing (EUC) Modernization, Enhanced Virtual Desktop Infrastructure (E-VDI) Expansion, Nonsecure Internet Protocol Router (NIPR) E-VDI Expansion, NIPR Network Technology Refresh, SecureView, Secure Internet Protocol Router (SIPR) E-VDI Expansion, and SIPR Tech Refresh.

k.      The SIPR Tech Refresh contracts, described in paragraphs (l) through (q) below, provide just one example of how the defendant and his coconspirators executed the wire fraud conspiracy.

l.      At the direction of and in consultation with Coconspirator Individual 1, the defendant drafted budgetary documents, including IGCEs, for the

13

SIPR Tech Refresh contracts. The defendant and others ensured that the IGCE for each base in the PACAF region contained line items that were never intended to be provided or were intentionally inflated.

 m. The defendant and other coconspirators built excess funding into the SIPR Tech Refresh IGCE, in part, by including line items for fictional part numbers that were never intended to be provided. The defendant also inflated other line items by excluding discounts that the defendant and coconspirators knew would be applied, which they referred to as "material savings."

 n. The defendant and coconspirators ensured that Coconspirator Company A received subcontracts for the inflated line items in the SIPR Tech Refresh contracts. Among other things, the defendant and Coconspirator Individual 1 ensured that Coconspirator Individual 3, who is an executive of Coconspirator Company A, had copies of the IGCEs for the project. Sharing the IGCEs gave Coconspirator Company A an advantage by allowing it to bid up to, without exceeding, the government's estimate.

 o. On or around November 18, 2022, after the SIPR Tech Refresh contracts were awarded, the defendant circulated to Coconspirator Individuals 1, 2, and 6 a ledger that identified the excess funds in the contracts that would be distributed between and amongst the conspirators. Below is an excerpt of that ledger:

| Actual Summary | | | |
|---|---|---|---|
| SUMMARY | Labor | Material | PMI |
| Rough Numbers | $6,868,978.23 | $19,818,967.40 | $6,136,362.48 |
| Savings | | $9,867,185.68 | |
| Expected Material $ | | $9,833,057.82 | |
| Usable | $6,868,978.23 | $9,867,185.68 | $ 6,136,362.48 |

p.      The ledger shows $9,867,185 of "material savings" and $6,136,362 in "PMI costs" that were fraudulently billed to and paid by the government for material line items and/or labor that were never provided. Together, the "material savings" and "PMI costs" constituted a $16,003,547 premium the government paid for IT Services under the SIPR Tech Refresh contracts as a result of the actions of the defendant and coconspirators.

q.      During the conspiracy, the defendant and coconspirators falsely invoiced and the government paid for at least $37 million of material and/or labor that was never provided to the government.

**The Conspiracy's Ledgers**

r.      The defendant, Coconspirator Individual 1, and others created and maintained several ledgers for the conspiracy, like the ledger above, identifying excess funds built into the contracts for which no material or labor were provided to the government. These ledgers tracked the conspiracy's profits and monitored distribution between the coconspirators and their friends and family members.

15

s.     For example, in 2018, the defendant's ledger identified over $1.1 million in excess funds from the SIPR E-VDI Expansion contract, split between Coconspirator Company D (color-coded with orange) and Coconspirator Company E (color-coded with blue):

| | Excess Material Funds | |
|---|---|---|
| | E-VDI Exp | E-VDI Exp |
| Hickam | $386,990.00 | REDACTED |
| Osan | $386,990.00 | |
| Yokota | $386,990.00 | |
| Andersen | | |
| | | |
| | $1,160,970.00 | |

t.     According to the defendant's ledger, Coconspirator Company D received $386,990 under the E-VDI Expansion contract for Hickam Air Base for materials that were not provided to the government. Coconspirator Company E received $386,990 under the E-VDI Expansion contract for Osan Air Base for materials that were not provided to the government and $386,990 under the E-VDI Expansion contract for Yokota Air Base for materials that were not provided to the government.

u.     The defendant and coconspirators, specifically including Coconspirator Individuals 1, 2, 3, and 6, used the ledgers to earmark government contracting funds for coconspirators and their friends and family members who provided no material and performed no labor called for by those government contracts and then directed coconspirator companies to make payments to those

16

individuals. The ledgers identified by name which coconspirator individuals would be paid by which coconspirator company.

v.     An excerpt from the 2019 ledger is included below by way of example:



| Company | Name | Salary |
|---|---|---|
| REDACTED subk | Alan James | $270,000.00 |

w.     According to this ledger, the defendant directed Coconspirator Company F to pay him a "salary" of $270,000 as a subcontractor (shown as "subk"). Coconspirator Company F then paid the defendant through TRAP, the shell company for which the defendant is the sole signatory. The defendant provided no material and performed no labor called for by any government contract in exchange for this "salary."

x.     The 2019 ledger detailed many other payments, including to Coconspirator Individuals 2, 5, 6, and 7, among others, to be paid by Coconspirator Companies A, B, E, and F.

### Bribery of a Public Official (18 U.S.C. §§ 201(b)(1)(B) and 2)

y.     From at least April 2016 and continuing to in or about April 2025, in the district of Hawaii and elsewhere, the defendant aided, counseled, commanded, and induced Coconspirator Companies A, B, E, F, and G through Coconspirator Individuals 3, 4, 5, 6, 7, 9, 10, and 11 to directly and indirectly corruptly give, offer, and promise things of value to Coconspirator Individual 1

17

while Coconspirator Individual 1 was a public official, with the intent to influence Coconspirator Individual 1 to commit, aid in committing, collude in, and allow fraud on the United States and to make opportunities for commission of fraud on the United States.

z.    The defendant aided, counseled, commanded, and induced the provision of things of value in the following ways, among others:

aa.    *First,* the defendant tracked excess funds from government contracts in ledgers, allocating at least $37 million in payments from those excess funds between and amongst coconspirators, including Coconspirator Individual 1's family members and Coconspirator Individual 2, who was Coconspirator Individual 1's co-inhabitant romantic partner. The defendant's ledgers helped Coconspirator Individual 1 organize which coconspirator companies would pay whom, including Coconspirator Individual 1's friends and family members.

bb.    The defendant directed coconspirator companies to make payments to Coconspirator Individual 1's brother, sister, brother-in-law, daughter, and Coconspirator Individual 2. The defendant also directed coconspirator individuals and companies to make payments or provide "salaries" to the defendant, his own family members, and family members of Coconspirator Individual 2, among others.

cc.     The ledgers identified family members of the coconspirator individuals by code names, using variations of "Al Capone" (also "AC" or "Capone"), "Godfather" (or "GF"), and "Godmother" (or "GM"). The below excerpt from a 2018 ledger identifies "salaries" to be paid using these nicknames:

|  | 17-18 Salary | 18-19 Raise |
|---|---|---|
| Godfather M | $50,000.00 | $0.00 |
| Godfather B | $50,000.00 | $0.00 |
| Godfather D | $50,000.00 | $0.00 |
| Godmother M | $50,000.00 | $0.00 |
| Godmother ?? | $50,000.00 | $0.00 |
| Capone M | $50,000.00 | $0.00 |
| Capone D | $50,000.00 | $0.00 |

dd.     "Godfather" was Coconspirator Individual 1's nickname, and "Godmother" was Coconspirator Individual 2's nickname. Salaries assigned to "Godfather" and "Godmother" in the ledgers were allocated to members of Coconspirator Individual 1 and 2's family, respectively. "Al Capone" was the defendant's nickname within the conspiracy. Lines titled "Capone M" and "Capone D" detailed payments to be made to the defendant's mother and father, respectively.

ee.     Members of Coconspirator Individuals 1 and 2's families, and the defendant's family did not perform work required by the contracts, despite receiving "salaries" or payments from coconspirator companies on those contracts. Yearly payments to Coconspirator Individual 1's friends and family members ranged from approximately $10,000 to $200,000.

19

ff.    *Second*, the defendant ensured there would be excess funds in government contracts, knowing that those funds would be available to be disbursed to, among others, Coconspirator Individual 1's friends and family members.

gg.    Among other methods, the defendant inflated IGCEs by creating and including fictitious part numbers and excess line items for material and labor. These inflated government estimates helped Coconspirator Individual 1 conceal the true cost of a contract so that the government would award excess funds to coconspirator companies.

hh.    *Third,* the defendant directed coconspirator companies how to bid, ensuring the coconspirator companies would be awarded government contracts that had excess funding built in. The defendant did this in part by sharing IGCEs with coconspirator individuals. As a result, coconspirator companies knew how much they could charge the government without exceeding the government estimates inflated by the defendant, Coconspirator Individual 1, and other coconspirators, while still being awarded a contract that built in excess funds.

ii.    The defendant took the foregoing actions before Coconspirator Individual 1 received the benefit of the bribes and with the intent to influence Coconspirator Individual 1 to commit or allow a fraud on the United States. By aiding, counseling, commanding, and inducing the giving, offering, and promising of the foregoing things of value, including direct and indirect financial benefits, to

Coconspirator Individual 1, the defendant acted with the intent to facilitate bribery. This fraud included rigging bids on Air Force IT contracts, overcharging the federal government for contracts, and paying individuals with government contract funds from line items for which they did not provide materials or perform labor.

jj.    From at least April 2016 and continuing through at least April 2025, the defendant and Coconspirator Companies A, B, E, F, and G through Coconspirator Individuals 3, 4, 5, 6, 7, 9, 10, and 11 knew that Coconspirator Individual 1 was a public official. Outside of payments to his friends and family members, Coconspirator Individual 1 also received payments and other things of value from other conspirators using money from excess contract funds siphoned from the government by the coconspirators.

kk.    One example of a thing of value given to Coconspirator Individual 1 is an all-expenses-paid three-day, two-night stay at a luxury resort on the North Shore of Oahu, from approximately October 8 to 10, 2023. At least as early as July 2023, Coconspirator Individual 2 began planning the event for conspirators and others, including Coconspirator Individuals 1-8. On or about July 27, 2023, Coconspirator Individual 2 emailed defendant, Coconspirator Individuals 1-8, and others, including the following information:

Dates: 8-10 Oct (9th is a government holiday)

This is an ALL EXPENSES paid event for 2 nights/3 days for Crew plus one!

Expenses include: Transportation (airfare for our off-island Crew), lodging, food, activities, etc. the whole nine yards!!

ll.     As part of their stay at the resort, coconspirator individuals took part in golf outings, horseback rides, and received massages. Coconspirators spent approximately $234,025 of funds that they had siphoned from the government through inflated contracts that had been awarded to conspirator companies. Coconspirator Individual 1, a government employee responsible for overseeing IT contracts, attended the luxury Hawaii resort vacation paid for with these funds.

## Conspiracy to Rig Bids (15 U.S.C. § 1)

mm.   From at least May 2019 and continuing to at least October 2022, in the District of Hawaii and elsewhere, the defendant knowingly conspired with others to suppress and eliminate competition by rigging bids for IT contracts awarded by the DOD. This conspiracy to rig bids occurred within the flow of, and substantially affected, interstate trade and commerce, including but not limited to the government's payment of inflated contract funds via interstate payments of U.S. federal government funds.

nn.    On or about May 9, 2019, the DOD posted a Request for Proposal (RFP) for Cyber Resiliency Experienced Workforce (the CREW contract). The RFP provided a small business set aside under Section 8(a) of the

22

Small Business Act (15 U.S.C. § 637(a)) but otherwise purported to be a competitive process.

oo.    The defendant conspired with Coconspirator Individual 1 and others to decide how much each contractor would bid in the purportedly competitive process for the CREW contract, and accordingly, which contractor would win the solicitation. The defendant and Coconspirator Individual 8 agreed to "ensure pricing is right" among the bidding companies. The defendant and others directed that (i) Coconspirator Individual 9 should submit a higher bid for Coconspirator Company B, (ii) Coconspirators Individuals 10 and 11 should submit a higher bid for Coconspirator Company E, and (iii) that Coconspirator Company C should submit a bid that was "low and stupid." Coconspirator Individuals 8 -11, Coconspirator Companies B, C, and E, and others agreed to bid as directed.

pp.    Coconspirator Companies B, C, and E submitted proposals to the DOD on or around June 18, 2019 according to the agreed-upon instructions. The DOD eliminated Coconspirator Company C from the bidding process for submitting a proposal that did not fit within the competitive range and directed Coconspirator Companies B and E to resubmit bids by September 3, 2019.

qq.    On September 25, 2019, DISA awarded the CREW contract to Coconspirator Company B.

rr.    A total of approximately $14,898,622.08 of government funds were obligated under the CREW contract.

## Other Relevant Conduct

ss.    From at least October 2018 continuing through at least January 2023, the defendant engaged in financial transactions with Coconspirator Companies A and H that were designed to conceal the source, ownership, or control of funds from IT contracts for which the defendant had fraudulently built in excess funding.

tt.    At Coconspirator Individual 3's direction, the defendant sent false invoices from TRAP to Coconspirator Company A, purporting to request payment for material and/or labor provided to Coconspirator Company A on IT contracts for which the defendant had built in excess funding. The defendant did not provide the material or labor identified in the false invoices to Coconspirator Company A through TRAP or otherwise. Coconspirator Company A paid TRAP by wire transfer the amount the defendant invoiced. The defendant knew the money transferred from Coconspirator Company A to TRAP's bank account represented the proceeds of a wire fraud scheme of which the defendant was a party. The defendant then made payments via wire transfer to Coconspirator Company H, at Coconspirator Individual 3's direction. Through these transactions,

24

a total of approximately $7,371,633.47 million was transferred from Coconspirator Company A to Coconspirator Company H through TRAP.

9. Pursuant to Section 6B1.2 of the United States Sentencing Guidelines, the parties agree that the charges to which the defendant is pleading guilty adequately reflect the seriousness of the actual offense behavior and that accepting this Agreement will not undermine the statutory purposes of sentencing.

## SENTENCING STIPULATIONS

10. Pursuant to CrimLR 32.1(a) of the Local Rules of the United States District Court for the District of Hawaii and Section 6B1.4 of the United States Sentencing Guidelines, the parties stipulate to the following for the purpose of the sentencing of the defendant in connection with this matter:

a. As it relates to Count One (conspiracy to commit wire fraud), under Section 2B1.1(b)(1)(L) of the United States Sentencing Guidelines, the loss attributable to the defendant was greater than $25,000,000 and less than $65,000,000, resulting in a 22-level enhancement.

b. As it relates to Count One, the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, as defined by Section 2B1.1(b)(10)(C) of the United States Sentencing Guidelines, resulting in a 2-level enhancement.

c.      As it relates to Count Two (bribery), under Section 2C1.1(b)(1) of the United States Sentencing Guidelines, more than one bribe was paid, resulting in a 2-level enhancement.

d.      As it relates to Count Two, under Section 2C1.1(b)(2) of the United States Sentencing Guidelines, the value obtained or to be obtained by a public official or others acting with a public official was greater than $25,000,000 but less than $65,000,000, resulting in a 22-level enhancement.

e.      As it relates to Count Three (conspiracy to rig bids), the defendant participated in an agreement to submit non-competitive bids as defined by Section 2R1.1(b)(1) of the United States Sentencing Guidelines, resulting in a 1-level enhancement.

f.      As it relates to Count Three, under Section 2R1.1(b)(2) of the United States Sentencing Guidelines, the volume of commerce attributable to the defendant was greater than $10,000,000 and less than $50,000,000, resulting in a 4-level enhancement.

g.      The United States agrees to recommend a fine of $30,000.

h.      As of the date of this Agreement, it is expected that the defendant will enter a plea of guilty prior to the commencement of trial, will truthfully admit his involvement in the offense and related conduct, and will not engage in conduct that is inconsistent with such acceptance of responsibility. If all

of these events occur, and the defendant's acceptance of responsibility continues through the date of sentencing, a downward adjustment of 2 levels for acceptance of responsibility will be appropriate. *See* USSG. §3E1.1(a) and Application Note 3.

i.     The United States agrees that the defendant's agreement herein to enter a guilty plea constitutes notice of intent to plead guilty in a timely manner, so as to permit the government to avoid preparing for trial as to the defendant. Accordingly, the United States anticipates moving in the government's Sentencing Statement for a one-level reduction in sentencing offense level pursuant to Guideline §3E1.1(b), if the defendant is otherwise eligible. The defendant understands that notwithstanding its present intentions, and still within the Agreement, the prosecution reserves the rights (1) to argue to the contrary in the event of receipt of new information relating to those issues, and (2) to call and examine witnesses on those issues in the event that either the United States Probation Office finds to the contrary of the prosecution's intentions or the Court requests that evidence be presented on those issues.

j.     The defendant agrees to deliver certified check(s) or money order(s) to the U.S. Attorney's Office in the amount of $1,451,656.80, payable to the "Clerk, U.S. District Court" at least five business days prior to sentencing. This payment will be applied toward the satisfaction of any assessment and restitution imposed at sentencing, pursuant to the judgment of the Court.

27

11.     The parties agree that notwithstanding the parties' Agreement herein, the Court is not bound by any stipulation entered by the parties but may, with the aid of the presentence report, determine the facts relevant to sentencing. The parties understand that the Court's rejection of any stipulation between the parties does not constitute a refusal to accept this Agreement since the Court is expressly not bound by stipulations between the parties.

12.     The parties represent that as of the date of this Agreement there are no material facts in dispute.

### APPEAL/COLLATERAL REVIEW

13.     The defendant is aware that he has the right to appeal his conviction and the sentence imposed. The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of sentencing, and any lawful restitution or forfeiture order imposed, or the manner in which the sentence, restitution, or forfeiture order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement. The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

a.     The defendant also waives the right to challenge his conviction or sentence or the manner in which it was determined in any collateral attack,

28

including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

b. If the Court imposes a sentence greater than specified in the Guidelines range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that Guidelines range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

c. The prosecution retains its right to appeal the sentence and the manner in which it was determined on any of the grounds stated in Title 18, United States Code, Section 3742(b).

## FINANCIAL DISCLOSURE

14. In connection with the collection of restitution or other financial obligations that may be imposed upon him, the defendant agrees as follows:

a. The defendant agrees to fully disclose all assets in which he has any interest or over which he exercises control, directly or indirectly, including any assets held by a spouse, nominee, or third party. The defendant understands that the United States Probation Office (USPO) will conduct a presentence investigation that will require the defendant to complete a comprehensive financial

statement. To avoid the requirement of the defendant completing financial statements for both the USPO and the government, the defendant agrees to truthfully complete a financial statement provided to the defendant by the government. The defendant agrees to complete the disclosure statement and provide it to the USPO within the time frame required by the United States Probation officer assigned to the defendant's case. The defendant understands that the USPO will in turn provide a copy of the completed financial statement to the government. The defendant agrees to provide written updates to both the USPO and the government regarding any material changes in circumstances, which occur prior to sentencing, within seven days of the event giving rise to the changed circumstances. The defendant's failure to timely and accurately complete and sign the financial statement, and any written update thereto, may, in addition to any other penalty or remedy, constitute the defendant's failure to accept responsibility under USSG §3E1.1.

b. The defendant expressly authorizes the government to obtain his credit report. The defendant agrees to provide waivers, consents, or releases requested by the government to access records to verify the financial information, such releases to be valid for a period extending 90 days after the date of sentencing. The defendant also authorizes the government to inspect and copy all financial documents and information held by the USPO.

c.      Prior to sentencing, the defendant agrees to notify the government before making any transfer of an interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.

## IMPOSITION OF SENTENCE

15.     The defendant understands that the District Court in imposing sentence will consider the provisions of the United States Sentencing Guidelines. The defendant agrees that there is no promise or guarantee of the applicability or non-applicability of any Guideline or any portion thereof, notwithstanding any representations or predictions from any source.

16.     The defendant understands that this Agreement will not be accepted or rejected by the Court until there has been an opportunity by the Court to consider a presentence report, unless the Court decides that a presentence report is unnecessary. The defendant understands that the Court will not accept an agreement unless the Court determines that the remaining charges adequately reflect the seriousness of the actual offense behavior and accepting the Agreement will not undermine the statutory purposes of sentencing.

## WAIVER OF TRIAL RIGHTS

17.    The defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    If the defendant persisted in a plea of not guilty to the charges against him, then he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by a judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the prosecution, and the judge all must agree that the trial be conducted by the judge without a jury.

b.    If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.

c.    If the trial is held by a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he or she was persuaded of the defendant's guilt beyond a reasonable doubt.

32

d.      At a trial, whether by a jury or a judge, the prosecution would be required to present its witnesses and other evidence against the defendant. The defendant would be able to confront those prosecution witnesses and his attorney would be able to cross-examine them. In turn, the defendant could present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

e.      At a trial, the defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.

18.    The defendant understands that by pleading guilty, he is waiving all of the rights set forth in the preceding paragraph. The defendant's attorney has explained those rights to him, and the consequences of the waiver of those rights.

## USE OF PLEA STATEMENTS

19.    If, after signing this Agreement, the defendant decides not to plead guilty as provided herein, or if the defendant pleads guilty but subsequently makes a motion before the Court to withdraw his guilty plea and the Court grants that motion, the defendant agrees that any admission of guilt that he makes by signing this Agreement or that he makes while pleading guilty as set forth in this Agreement may be used against him in a subsequent trial if the defendant later

33

proceeds to trial. The defendant voluntarily, knowingly, and intelligently waives any protection afforded by Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence regarding the use of statements made in this Agreement or during the course of pleading guilty when the guilty plea is later withdrawn. The *only* exception to this paragraph is where the defendant fully complies with this Agreement but the Court nonetheless rejects it. Under those circumstances, the United States may not use those statements of the defendant for any purpose.

20.     The defendant understands that the prosecution will apprise the Court and the United States Probation Office of the nature, scope and extent of the defendant's conduct regarding the charges against him, related matters, and any matters in aggravation or mitigation relevant to the issues involved in sentencing.

## COOPERATION

21.     The defendant agrees that he will fully cooperate with the United States.

a.     The defendant agrees to testify truthfully at any and all trials, hearings, or any other proceedings at which the prosecution requests him to testify, including, but not limited to, any grand jury proceedings, trial proceedings involving co-defendants and others charged later in the investigation, sentencing hearings, and related civil proceedings.

b.     The defendant agrees to be available to speak with law enforcement officials and representatives of the United States at any time and to give truthful and complete answers at such meetings, but he understands he may have his counsel present at those conversations, if he so desires.

c.     The defendant agrees he will not assert any privilege to refuse to testify at any grand jury, trial, or other proceeding, involving or related to the crimes charged in this Information or any subsequent charges related to this investigation, at which the prosecution requests him to testify.

d.     The defendant agrees to not violate any federal, state, or local law between the time the defendant signs this Agreement and the date of sentencing.

e.     The defendant agrees that his sentencing date may be delayed based on the government's need for the defendant's continued cooperation and agrees not to object to any continuances of the defendant's sentencing date sought by the United States.

f.     Pursuant to Section 1B1.8(a) of the United States Sentencing Guidelines, the prosecution agrees that self-incriminating information provided pursuant to this Agreement to cooperate will not be used in determining the applicable Guidelines range, except as may be provided in this Agreement and under Section 1B1.8(b) of the United States Sentencing Guidelines.

35

22.    In the event that the defendant does not breach any of the terms of this Agreement but the Court nonetheless refuses to accept the Agreement after the defendant has made statements to law enforcement authorities or representatives of the United States pursuant to this Agreement, the prosecution agrees not to use said statements in its case-in-chief in the trial of the defendant in this matter. The defendant understands that this does not bar the use of information and evidence derived from said statements or prohibit the use of the statements by the prosecution in cross-examination or rebuttal.

23.    Pursuant to Guidelines §5K1.1 and Rule 35(b) of the Federal Rules of Criminal Procedure, the prosecution may move the Court to depart from the Guidelines on the ground that the defendant has provided substantial assistance to authorities in the investigation or prosecution of another person who has committed an offense. The defendant understands that:

a.    The decision as to whether to make such a request or motion is entirely up to the prosecution.

b.    This Agreement does not require the prosecution to make such a request or motion.

c.    This Agreement confers neither any right upon the defendant to have the prosecution make such a request or motion, nor any remedy to the defendant in the event the prosecution fails to make such a request or motion.

36

d.    Even in the event that the prosecution makes such a request or motion, the Court may refuse to depart from the Guidelines or to impose a sentence below the minimum level established by statute.

24.    The defendant and his attorney acknowledge that, apart from any written proffer agreements, if applicable, no threats, promises, agreements or conditions have been entered into by the parties other than those set forth in this Agreement, to induce the defendant to plead guilty. Apart from any written proffer agreements, if applicable, this Agreement supersedes all prior promises, agreements or conditions between the parties.

25.    To become effective, this Agreement must be signed by all signatories listed below.

//

//

//

//

//

//

//

//

//

37

26.    Should the Court refuse to accept this Agreement, it is null and void and neither party shall be bound thereto.

AGREED:

OMEED A. ASSEFI
Acting Assistant Attorney General
United States Department of Justice
Antitrust Division

_____    Dated: ___3/31/26___

REBECCA A. BERS
DON DANIEL
MATTHEW CHOU
Trial Attorneys

KENNETH M. SORENSON
United States Attorney
District of Hawaii

_____    Dated: ___4/1/26___

AISLINN K. AFFINITO
Chief, Major Crimes

_____    Dated: ___APR - 1 2026___

DARREN W.K. CHING
Assistant U.S. Attorney

_____    Dated: ___3/17/26___

ALAN JAMES
Defendant

_____    Dated: ___3/17/26___

ERICA B. GIESE
Attorney for Defendant

38